UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| R&J Components Corporation, <br><br> Plaintiff, <br><br> vs. <br><br> Centimark Corporation and Siu Professional Roofing, LLC <br><br> Defendants. | Civil Action No. 2:23-CV-358 <br><br><br> **DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERT MIKEY MINOR** |

**NOW COME** Defendant Centimark Corporation ("Centimark") and Defendant Siu Professional Roofing, LLC ("SIU") by and through undersigned counsel, before trial and selection of the jury, and respectfully moves the Court for an Order excluding the expert testimony of Mikey Minor ("Minor") or otherwise limiting his ability to testify as to the market value of the inventory at issue and extent of the alleged damage to the inventory.

This motion is based on Minor's lack of specialized knowledge and experience, his inadequate investigation, his unreliable methodologies, and his speculative conclusions that fail to meet the standards for admissible expert testimony under Federal Rules of Evidence 401, 402, 403, 702, and 703.

Minor's deposition testimony reveals fundamental deficiencies in his analysis that render his proposed testimony unreliable and lacking sufficient factual foundation.

**LEGAL STANDARD**

The admissibility of expert opinions, like all evidence, rests with the trial court: "the trial court serves as the gatekeeper and must decide whether the evidence submitted by a party is admissible pursuant to the Rules of Evidence as a matter of law." *Watson v. Ford Motor Co*., 389

1

S.C. 434, 445, 699 S.E.2d 169, 174 (2010); *Jamison v. Morris*, 385 S.C. 215, 228, 684 S.E.2d 168, 175 (2009) (describing Rule 702, SCRE, as "impos[ing] an affirmative and meaningful gatekeeper function on the trial judge." (citing *State v. White*, 382 S.C. 265, 269–70, 676 S.E.2d 684, 686 (2009))). However, "expert testimony receives additional scrutiny relative to other evidentiary decisions." *Watson*, 389 S.C. at 446, 699 S.E.2d at 175 (emphasis added).

"[I]n executing its gatekeeping duties, the trial court must make three preliminary findings which are fundamental to Rule 702 before the jury may consider expert testimony." Id. These fundamental and mandatory "preliminary findings" are: First, the trial court must find that the subject matter is beyond the ordinary knowledge of the jury, thus requiring an expert to explain the matter to the jury. See *State v. Douglas*, 380 S.C. 499, 502–03, 671 S.E.2d 606, 608 (2009). Next, while the expert need not be a specialist in the particular branch of the field, the trial court must find that the proffered expert has indeed acquired the requisite knowledge and skill to qualify as an expert in the particular subject matter. See *Gooding v. St. Francis Xavier Hosp.*, 326 S.C. 248, 252–53, 487 S.E.2d 596, 598 (1997).

The final inquiry—reliability—is the central feature of the admissibility analysis. White, 382 S.C.at 270, 676 S.E.2d at 686; see also *Fernandez v. Spar Tek Indus., Inc.*, No. 0:06-3253-CMC, 2008 WL 2185395 (D.S.C. May 23, 2008) ("It follows that an opinion based on an inadequate or inaccurate factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert."); *Watson*, 389 S.C. at 458, 699 S.E.2d at 181 (quoting *Gen. Elec. v. Joiner*, 522 U.S. 136, 143 (1997) ("Nothing . . . requires a . . . court to admit opinion evidence which is connected . . . only by the *ipse dixit* of the expert")). The party offering the expert has the burden of showing his witness possesses the necessary

learning, skill, or practical experience to enable the witness to give opinion testimony. *Thomas Sand Co. v. Colonial Pipeline Co.*, 349S.C. 402, 411, 563 S.E.2d 109, 114 (Ct. App. 2002)

Furthermore, **"[t]he familiar evidentiary mantra that a challenge to evidence goes to 'weight, not admissibility' may be invoked only after the trial court has vetted the matters of qualification and reliability and admitted the evidence**." *White*, 382 S.C. at 274, 676 S.E.2d at 689 (emphasis added). This is especially so "because juries may accord excessive or undue weight to 'expert' testimony"; therefore, "[t]rial courts should be cautious in conferring an expert label upon a witness." *Watson*, 389 S.C. at 449, 699 S.E.2d at 176; see also generally *White*, 372 S.C. 364, 376, 642 S.E.2d 607, 613 (Ct. App. 2007) (noting that the standard for admissibility of expert evidence "is designed to prevent the fact finders from being misled by the aura of infallibility surrounding unproven scientific methods."

Under Federal Rule of Evidence 702, expert testimony is admissible only if: (1) the expert's scientific technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.

## ARGUMENT AND AUTHORITIES

1. **Minor does not have the Specialized Knowledge to Assist the Trier of Fact with Regard to the Fair Market Value of the Inventory at Issue.**

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness, *qualified as an expert by knowledge, skill, experience, training, or education*, may testify thereto in the form of an opinion or otherwise. See State v. Council, 335 S.C. 1, 20, 515 S.E.2d 508, 518 (1999) (emphasis added).

Plaintiff designated Minor as an expert witness in this case on the issues of

1. The extent of the property damage

2. The value of the loss

[Exhibit A, Plaintiff's Designation of Experts].

However, Minor has no particular knowledge, training, skill, or experience that would assist the jury as to determining value of the allegedly damaged inventory. [Exhibit B, Minor Curriculum Vitae]. Neither Minor nor Tech Loss is a market participant in the market for integrated circuits. *Id*. Minor performed made phone calls and internet research that anyone could have done and, therefore, does not merit expert level qualification as to opinions about value.

## 2. The Expert's Methodology is Unreliable and Lacks Proper Application to the Facts of the Case.

The Court must vet reliability of the substance of expert testimony before its admission. *Watson v. Ford Motor Co*., 389 S.C. 434, 446, 699 S.E.2d 169, 175 (2010) (citation omitted) ("[E]xpert testimony receives additional scrutiny relative to other evidentiary decisions. [T]he trial court must evaluate the substance of the testimony and determine whether it is reliable." (emphasis added)); *White*, 382 S.C. at 274, 676 S.E.2d at 689. As a general premise, exclusion is warranted where an expert bases his opinion "on an inadequate. . . foundation." See, e.g., *Fernandez v. Spar Tek Indus., Inc.*, No. 0:06-3253-CMC, 2008 WL 2185395 (D.S.C. May 23, 2008) ("It follows that an opinion based on an inadequate . . . factual foundation cannot be a reliable opinion, no matter how valid the principles and methods applied or how well-qualified the expert." (emphasis added)); *Watson*, 389 S.C. at 458, 699 S.E.2d at 181 (quoting *Gen. Elec. v. Joiner*, 522 U.S. 136, 143 (1997) ("Nothing . . . requires a . . . court to admit opinion evidence which is connected . . . only by the *ipse dixit* of the expert")).

4

To determine the reliability of an expert's testimony, the following factors should be taken into consideration:

(1) the publications and peer reviews of the technique;

(2) prior application of the method to the type of evidence involved in the case;

(3) the quality control procedures used to ensure reliability; and

(4) the consistency of the method with recognized scientific laws and procedures.

*State v. Jones*, 343 S.C. 562, 573, 541 S.E.2d 813, 819 (2001). "Once the evidence is admitted under these standards, the jury may give it such weight as it deems appropriate." *Council*, 335 S.C. at 20–21, 515 S.E.2d at 518; *Matter of Ridley*, 433 S.C. 316, 320–21, 858 S.E.2d 165, 167–68 (Ct. App. 2021).

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999), the Supreme Court considered whether the trial court properly excluded expert testimony as unreliable because the methodology "fell outside the range where experts might reasonably differ." *Id*. The court considered "the methodology employed by the expert in analyzing the data obtained in the visual inspection, and the scientific basis, if any, for such an analysis.". *Id*. at 153, 1176-77.

Here, Minor's testimony and opinions are not reliable. He conceded in his deposition that he failed to determine the extent of the damage, and whether the damage was often did not identify whether the "contamination" he observed in his inspections was caused by exposure to water or by "dust" and debris from months or years of items sitting in a carboard box, without a top, in the warehouse. Minor does not clarify what the contamination is or how it is classified.

**Q**. As we'll see and as you know, you use the word dust a fair amount in your notes. What do you mean when you say dust?

**A**. Debris of a small size.

5

**Q**. Sure. And I'm wondering: Are you including mold in that definition?

**A**. No. I would use the word mold specifically if I was referring to mold.

[Exhibit C, Dep. of Minor 111:5-12].

Minor declared items had been damaged by water but did not investigate the *product* to determine if it was actually damaged. Many of the products stored in the warehouse are in individual sealed boxes. No boxes were opened to see if the water infiltrated the box and damaged the product itself.

> **Q**. So besides this box that shows signs of heavy contamination, my question related to whether you were aware of any evidence or photographs that would show heavy contamination to the subject inventory itself in Gaylord 1582.
> **A.** If the boxes don't qualify as part of the inventory, then yes.
> **Q.** Well, the subject inventory is the part numbers and the actual inventory that's being stored inside the boxes.
> **A.** Yeah. My understanding of the electronic components is that their packaging is also part of what is sold when they're sold, and, therefore, it's part of the subject inventory.
> **Q.** Okay. So you're saying that if a box in the photo that you've referenced -- if the box is damaged that much, you're saying that means the inventory is damaged?
> **A.** Correct.
> **Q.** Okay. But to your knowledge, no one has opened up that box and actually tested the inventory inside it to see if it still works, correct?
> **A.** Correct.

[Dep. of Minor 135:3-136:1].

Minor failed to distinguish between damaged packaging and damaged inventory because he never tested the allegedly damaged inventory to determine whether it still has functionality.

Minor failed to consider Plaintiff's prior sales data for the allegedly damaged inventory as part of his calculation of value.

> **Q**. Did TechLoss ever evaluate R&J's prior sale data?
> **A**. No.

[Dep. of M. Minor 58:22-24].

Minor failed to analyze R&J's costs of acquisition for the allegedly damaged inventory.

**Q**. Did TechLoss ever evaluate R&J's cost of acquisition for the subject inventory?
**A.** No.

[Dep. of M. Minor 58:25 – 59:2]

Minor failed to analyze potential resale value of the allegedly damaged inventory.

**Q**. Did TechLoss ever do any kind of analysis of the potential resale value of this actual subject inventory that forms the basis of R&J's claims?
**A.** No.

[Dep. of M. Minor 59:3-7].

Minor failed to analyze salvage value of the allegedly damaged inventory or given

Defendants credit for the same.

**Q**. Did TechLoss ever perform any analysis of the salvage value of the subject inventory?
**A.** No.

[Dep. of M. Minor 59:8-10].

Minor failed to analyze whether the allegedly damaged inventory was obsolete.

**Q**. If called to testify at trial, will you or anyone at TechLoss offer opinions about whether the subject inventory was obsolete?
**A.** No.
**Q**. No, as in you won't offer opinions on that topic one way or the other? Is that what you mean?
**A.** Correct.

[Dep. of M. Minor 105:25 – 106:7].

Minor and his Tech Loss team made subjective evaluations of the level of contamination

that was observed on the allegedly damaged inventory.

**Q.**    Were any objective factors used in making those determinations between heavy, medium, and light?
**A.**    When the three of us that were on-site had conversations about the levels of contamination that we anticipated seeing and that we were seeing, there was direction given by me to them as to what should qualify in each of those categories. But at the end of the day, whoever was evaluating that piece of equipment, there would be subjectivity because we all have different opinions.

7

**Q**.     And what factors were considered by the folks who were making those subjective decisions?

**A**.     Types and levels of contamination that were being observed.

[Dep. of Minor 69:8-23].

This court has held that, in this negligence case in which Plaintiff alleges damage to property, the measure of damages is fair market value. [See Order Denying Defendants' Motions for Summary Judgement, Entry No. 52].

South Carolina courts have recognized the following definitions of "fair market value": (1) "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's length transaction"; (2) "the price which a willing buyer will pay a willing seller, neither being under compulsion to buy or sell". *Austin v. Stokes-Craven Holding Corp*., 387 S.C. 22, 43, 691 S.E.2d 135, 146 (2010) *citing Mazloom v. Mazloom*, 382 S.C. 307, 321, 675 S.E.2d 746, 753 (Ct.App.2009). Plaintiff attempts to equate replacement cost value under a first-party insurance contract, under which an insurance carrier is <u>required</u> to pay replacement cost value as defined by the policy to fair market value recoverable in a tort case. The two are not the same, and the definitions of fair market value recognized by the South Carolina Supreme Court are instructive. The *Austin* court noted that the fair market value is the price a buyer will pay and a seller will sell, when neither are "under compulsion to buy or sell".

Minor testified that part of his research and his calculation of replacement cost value included the fact that he had to obtain the specific quantity to replace. [*See* Minor Dep. 81:14-82:13, Aug. 28, 2024 (wherein Minor testified that he used the $10 per unit price proposed by Plaintiff as the replacement cost value rather the $.63 he found doing his online research)]. Therefore, contrary to South Carolina's definition of fair market value, Minor's opinions about valuation were formed based on a need to replace a certain quantity as opposed to an arm's length

8

transaction with a willing seller and a willing buyer, *neither being under compulsion to buy or sell*.

Minor testified:

> **Q**.     If TechLoss did its own research on the price of the replacement cost for the subject inventory listed in Line Item 28 and it came up with what it looks like four different price points, why didn't TechLoss use its knowledge, training, skill, and experience to commit to one of those prices and use that to form its opinions?
> **A**.     We did.
> **Q**.     How? You just told me that you used the price point that was submitted by R&J.
> **A**.     Correct. After analysis. So we adopted their number as appropriate after our research and using the description you just said, our skill and knowledge and expertise.
> **Q**.     But why wouldn't you adopt the 63 cent data point based on the research that you did? Why is R&J's number any more accurate than Kynix? If I'm saying that correctly.
> **A**.     Kynix had a quantity of 10,000 of these parts, which was not representative of the need for 135,000 parts.
> **Q**.     Well, if you had kept researching, is it possible that TechLoss could have found numerous different sellers who could have eventually filled the order that TechLoss and R&J believe is necessary? 135,000.
> **A**.     It's possible.

[Dep. of M. Minor 83:10 - 84:13].

Plaintiff made a first-party insurance claim with its property carrier, Chubb Insurance. [Minor Dep. at 97: 7-10; 110:5-12]. The insurance policy issued by Chubb required Chubb to pay replacement cost value to Plaintiff for the inventory. [*Id*. at 110:1-4]. The Chubb policy provides that the measure of damage pursuant to the policy is "replacement cost at the time of loss or damage". [*See* Chubb Policy, pg. 21 of 29]. Chubb hired Mikey Minor of Tech Loss to determine the replacement cost value of the inventory. [*Id*. at 110:17-25; 111:1-3; *see also* Minor Dep. 22:12-23; 137:11-19]. Minor set forth his findings in an excel spreadsheet where he determined that the total replacement cost value of all claimed items (including those where he observed "no visible contamination" to them) of inventory was $15,003,217.32. [*Id*. at 62:18-63:3]. Minor admits that

his actual purpose was only to determine the value of the loss exceeded Chubb's policy limits, not to determine the fair market value of the allegedly damaged inventory.

> Q.     Looking at the next paragraph, the last sentence, it says: You also informed us that the insured has a business coverage limit of 2.1 million, so if we identified damages meeting that amount, there was no need to review further. Did I read that correctly?
> A.     Yes.
> Q.     Is that what TechLoss did here?
> A.     Yes, with the caveat that I believe we insured that that number was beyond 2.1 million to ensure a cushion, if you will, if some of the pricing was fluctuated.

[Dep. of M. Minor 47:2-14].

During his deposition, Mr. Minor confirmed that his research established the replacement cost value of the inventory pursuant to the Chubb policy. [*Id*. at 64:23-25; 83:10-25; 103:21-104:4; 154:2-6]. Mr. Minor further admitted that he would not be offering any opinions about the fair market value of the inventory. [*Id*. at 90:23 – 91:22; 154:2-26].

Minor testified in his deposition that he has given no opinions about the fair market value of the inventory. Dep. of M. Minor 90:23-92:7.

> Q.     At any point since its involvement with this particular claim and this litigation, has TechLoss ever been asked to offer opinions to a reasonable degree of certainty about the fair market value of the subject inventory?
> A.     No.
> Q.     If called to testify at trial, will you offer any opinions about the fair market value of the subject inventory?
> A.     No.

See also *Id*. at 154:14-17

> Q.     You never did any kind of analysis of the actual inventory to determine what its value is on the marketplace as of the date of the loss?
> A.     Correct.

Accordingly, Mr. Minor's testimony unequivocally confirms that the pricing data set forth in the Tech Loss spreadsheet does not reflect the fair market value of the allegedly damaged inventory.

Instead, this data reflects replacement cost value of the inventory, which is payable under the first party insurance contract between Chubb and Plaintiff and is not the appropriate measure of damage in this case.

Further, Minor's methodology is unreliable because he simply accepts Plaintiff's allegations. See *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422, 424 (5th Cir. 1987) ("If an opinion is fundamentally unsupported, then it offers no expert assistance to the jury. . . .Without more than credentials and a subjective opinion [based on plaintiff's allegations], an expert's testimony that 'it is so' is not admissible." Such testimony "is no more than [plaintiff's allegations] dressed up and sanctified as the opinion of an expert."). For example, Minor simply accepted Plaintiff's assertion that all skids *claimed by Plaintiff* as damaged did, in fact, sustain damage.

> **Q**. Sorry. Didn't mean to cut you off. Did you assume that the subject inventory listed in the line items with no dollar values were contaminated?
> **A**. Yes. It was our understanding that that list was of all the equipment or components being claimed as part of this claim.
> **Q**. Right. And that's the list that R&J says contained contaminated subject inventory, correct?
> **A**. Correct.
> **Q**. Did TechLoss do anything to verify that was accurate as it relates to alleged contamination?
> **A.** No.

[Dep. of M. Minor 49:14 – 50:3].

Minor made assumptions about the quantities of allegedly damaged inventory and just accepted the quantities claimed by Plaintiff.

> **Q**.     Looking at the quantity column, if the quantity is shaded as green, what does that mean?
> **A**.     That's indicative that our inspected quantity matched the proposed quantity or the quantity in the documentation provided to us prior to our inspection.
> **Q**.     Okay. So looking again at Line 28, are you saying that TechLoss actually counted 135,000 units of inventory?
> **A**.     Not individually.
> **Q**.     Okay. How did TechLoss determine that the quantity submitted by R&J was accurate?

**A.**     Making some assumptions here that these were in boxes with quantities on them and the boxes did not appear to be of a partial quantity. Then that total quantity may have been made up from doing some math on the quantity expected to be in each of those boxes and then possibly plus any loose items or spot-checking some of those boxes to confirm the number that were inside of them.

[Dep. of Minor 82:14 - 83:9; 86:2-11].

**Q.**     Well, my question -- and it really relates to all of these. I mean, all of the quantities used in this spreadsheet -- what I think everyone wants to know in this case and definitely speaking for myself, I mean, are they exact quantities, or are they approximate quantities?

**A.**     Some are exact, and some are approximate because we did not count every individual component.

[Dep. of Minor 86:2-11].

Minor adopted Plaintiff's proposed pricing for the allegedly damaged inventory when online research failed to generate a replacement cost.

**Q.**     Are you able to identify the subject inventory on Exhibit 80 where TechLoss used R&J's cost per data?

**A.**     Yes.

**Q.**     Can you do that for us, please?

**A.**     Yes. In the researched costs columns, in the cost per sub column, anything highlighted in yellow is indicating that the price matches -- the price in the cost per column of researched matches the price in the cost per column of proposed.

**Q.**     Meaning what?

**A.**     If our research didn't identify a specific source for a component, then we would have come up with a price based on other factors. Oftentimes a component is very similar to another component, has the same footprint, very similar operation but slightly different tolerance or value, and, therefore, we would have looked at those factors and then looked at the proposed price and said, yes, we agree the proposed price is reasonable and can be used for our calculations.

**Q.**     So the yellow cells are the only cells where you agreed with R&J?

**A.**     No. The yellow cells are where we didn't have our -- where our independent pricing wasn't from a specific source. So we utilized R&J's number for the sake of calculation.

**Q.**     TechLoss just adopted R&J's number in the yellow cells, correct?

**A.**     Correct.

[Dep. of M. Minor 77:22 - 79:3].

12

Minor never independently investigated or verified the list of skids that were actually exposed to moisture on April 7, 2022. He just accepted Plaintiff's allegations.

> **Q**.     Will you offer any opinions about what skids or Gaylords were actually impacted by the April 7 water loss?
> **A**.     I will offer opinions on the Gaylords that had contamination present. As to whether that applies to the date of loss, that would just be what was reported to me in that regard.
> **Q**.     And you're touching on what I'm asking, so I'll drill down a little bit. Are your opinions that the contamination that you observed were from the April 7 water loss?
> **A**.     I have no opinion on that.

[Dep. of M. Minor 43:8-20].

Finally, Minor's methodology and opinions are unreliable because he assigned value to items that his own investigation showed did not show any evidence of damage or, to use his word, "contamination."

> **Q**. Okay. But nevertheless, as a part of your investigation, you're assigning a value of damage to certain subject inventory that was being stored in Skid 1718 even though that inventory was sealed in plastic and had no visible signs of contamination, correct?
> **A.** Correct.

[Dep. of Minor 141:20 – 142:1]. See also [Depo of Minor 142:24-143:9] where Minor testified as follows:

> **Q**. And TechLoss' recommendation to Chubb that Chubb ultimately followed was based upon assigning dollar values of damage to inventory that was sealed in packaging with no visible signs of contamination, correct?
> **A**. Some of it, yes.
> **Q**. And we just went through an example in Skid 1718 of that, correct?
> **A**. Correct.
> **Q**. And there are other examples, correct?
> **A**. Yes.

Minor's calculations, opinions, and methodology lack adequate evidence, are simply adoptions of Plaintiff's allegations, and are unreliable. Accordingly, this Court should exercise its

13

"gatekeeping" function and exclude Minor from testifying as an expert on the extent of the alleged

damage and the value of the loss. Rule 702 an all relevant authority demands such a result.

On this 9th day of October 2025

Respectfully submitted by:

CLARKSON, WALSH, & COULTER, P.A.


_____s/*Michelle Endemann*_____
Michelle Endemann, Esq.
Fed Bar No.: 11010
497 St. Andrews Blvd
Charleston, SC 29407
T: 843.936.5043
michelle.endemann@clarksonwalsh.com

***Attorneys for Defendant Centimark Corporation***

*and*

Brian E. Wolfe DSC Fed ID No. 12279
Robert C. Gunst, Jr. DSC Fed ID No. 12909
Josh Hinson, DSC Fed ID No. 12916
WOLFE, GUNST & HINSON, PLLC
215 Queens Road, Suite 200
Charlotte, NC 28204
T. 704-827-3774
F. 252-408-6859
E. bwolfe@wolfegunst.com
E. rgunst@ wolfegunst.com
E. jhinson@ wolfegunst.com

***Attorneys for Defendant Siu Professional Roofing, LLC***

14